Filed 6/6/14  Olson v. Price CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHARLES OLSON,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>MARY PRICE,<br><br>      Defendant and Respondent. | B242155<br><br>(Los Angeles County<br>Super. Ct. No. NC054048) |

APPEAL from judgment of the Superior Court of Los Angeles County, Ross M. Klein, Judge.  Reversed.

Zelner & Karpel and Barry S. Zelner for Plaintiff and Appellant.

Ford, Walker, Haggerty & Behar, John K. Paulson and Daniel C. Heaton for Defendant and Respondent.

_____

## INTRODUCTION

Plaintiff Charles Olson sued defendant Mary Price for personal injuries allegedly arising from a motor vehicle accident. Defendant admitted she was negligent, but denied the low-speed accident caused any harm to plaintiff. The jury returned a special verdict in favor of defendant, finding her negligence was not a substantial factor in causing plaintiff's injuries. On appeal, plaintiff contends he is entitled to a new trial because the court abused its discretion in allowing defendant's medical expert to testify to opinions that were not disclosed before trial. We agree.

The purpose of expert discovery is to give fair notice of what an expert will say at trial. At his deposition, defendant's expert affirmed that he had stated all opinions he intended to give at trial, and agreed to notify plaintiff, prior to trial, if he formed any other opinions. Despite these assurances, on the last day of trial, defendant's expert testified to a new opinion—formed 10 days earlier—that had not been disclosed to plaintiff. The trial court allowed the expert's testimony over plaintiff's vigorous objections. This error resulted in a miscarriage of justice. Accordingly, we will reverse the judgment and remand the case for a new trial.

## FACTS[1] AND PROCEDURAL BACKGROUND

### 1.     *The Accident*

Plaintiff, now age 46, has played the piano since he was eight years old. At the time of the subject automobile accident, plaintiff worked three nights a week as a keyboardist at various hotels and night clubs in Las Vegas. During the other part of the week, plaintiff worked as a piano instructor in Los Angeles. He regularly commuted between the two cities.

---

[1]     Because we consider the weight of the evidence in determining whether the trial court's error was prejudicial, we state the facts without deference to the jury's special verdict finding. (See, e.g., *Herbert v. Lankershim* (1937) 9 Cal.2d 409, 463-480; *Downing v. Barrett Mobile Home Transport, Inc*. (1974) 38 Cal.App.3d 519, 525; see also *People v. Pizarro* (2013) 216 Cal.App.4th 658, 688 ["appellate courts are called upon to consider the weight of the evidence in applying harmless error analysis to ordinary trial error scenarios"].)

The accident occurred on February 27, 2008, at an intersection in Long Beach, California. Plaintiff was stopped at a red light, tightly gripping the steering wheel, when he felt a sudden impact that caused his left hand to snap off the steering wheel, twisting his left wrist. After exiting the vehicle, plaintiff discovered his car had been hit on the rear driver side by defendant's vehicle. The impact caused the rear end of plaintiff's vehicle to rotate toward the passenger side.

Plaintiff claimed his left wrist felt broken after the accident, but he did not discuss his injuries with anyone at the scene. He did not receive paramedic treatment, and he drove his vehicle from the scene of the accident back to Las Vegas. During the drive, plaintiff discovered the vehicle's wheels had been knocked out of alignment. The total cost to repair the damage exceeded $4,000.

Upon returning to Las Vegas, plaintiff met with his friend, Julio Herzer. Plaintiff told Mr. Herzer about the accident and the pain in his wrist. Plaintiff also complained about pain in his neck and back. Mr. Herzer testified that plaintiff's left wrist was slightly more swollen than the other, and plaintiff was unable to grip or swing a new set of golf clubs that Mr. Herzer showed him that night.

The following Monday, March 3, 2008 (five days after the accident), plaintiff saw a doctor at the Las Vegas Pain Institute. During the doctor's examination, plaintiff had significant pain and difficulty rotating his left wrist. He was referred for X-rays that day. The doctor also placed a brace on plaintiff's wrist.

Plaintiff claimed he was unable to do strenuous activities since the accident. Due to the pain in his wrist, plaintiff testified he had performed only a handful of shows in Las Vegas. Each time his wrist swelled up after twenty minutes playing the piano.

2.    *The Complaint and Plaintiff's Wrist Surgery*

On January 26, 2010, plaintiff filed a single count complaint against defendant for personal injuries allegedly caused by the February 27, 2008 accident.

In January 2011, plaintiff saw an orthopedic surgeon, Dr. Jacob Tauber, about the ongoing pain in his wrist, neck and back. Dr. Tauber ordered an MRI of plaintiff's wrist and referred plaintiff to a hand specialist, Dr. Edwin Ashley, for further examination.

3

Upon examination of the MRI, Dr. Ashley identified a tear of the triangular fibrocartilage complex (TFCC) — a cartilage structure linking the forearm to the wrist bones. Based on the MRI finding, Dr. Ashley recommended wrist surgery, which he performed on January 20, 2012. The video arthroscopy used in performing the surgery confirmed plaintiff's left wrist had a torn TFCC.

3. *Defendant's Medical Expert's Deposition Testimony*

On October 7, 2011, and January 30, 2012, plaintiff took the deposition of defendant's medical expert, Dr. Michael Weinstein, an orthopedic surgeon specializing in neck and back rehabilitation surgery.[2] The first session of Dr. Weinstein's deposition focused on his opinions concerning plaintiff's alleged neck and back injuries. The second deposition session, taken after Dr. Weinstein conducted a physical examination of plaintiff, focused principally on Dr. Weinstein's opinions concerning plaintiff's alleged wrist injury.

Based on his examination of plaintiff's wrist, Dr. Weinstein testified plaintiff possibly had "a wrist sprain and some mild degenerative changes in his wrist," but there was nothing "objective for any acute or traumatic injury." He also testified, contrary to Dr. Ashley's finding, that the MRI did not show "a complete tear" of the TFCC, but at most indicated "some tendinitis and a partial tear."

At the time of his second deposition session, Dr. Weinstein had not yet reviewed the arthroscopic video from Dr. Ashley's surgery on plaintiff's wrist. When asked to assume the arthroscopy confirmed a TFCC tear, Dr. Weinstein opined that plaintiff's repetitive use of his hands while playing the piano "could cause some degenerative changes and tearing of the [TFCC]." When asked if he had any other opinions

---

[2]    Plaintiff filed an opposed motion to augment the appellate record with complete transcripts of Dr. Weinstein's deposition. In the interest of fully relating the facts relevant to the claim of error, we grant the motion. (See *Gallanis-Politis v. Medina* (2007) 152 Cal.App.4th 600, 608.) In any event, Dr. Weinstein admitted in his trial testimony that the challenged opinion was not disclosed in his deposition or at any time prior to trial, despite his promise to do so. Based on this testimony, we would reach the same conclusion absent the augmented record.

concerning plaintiff's left wrist that had not been expressed, Dr. Weinstein said he did not, but he would be willing to review the arthroscopic video. Dr. Weinstein was then asked if he would advise plaintiff if any of his opinions changed before trial. Dr. Weinstein affirmed he would advise plaintiff of any new or changed opinions through defense counsel.

4.    *Plaintiff's Experts' Trial Testimony Concerning the Wrist Injury*

Because defendant admitted fault for the accident, the factual disputes at trial principally focused on the severity of the vehicle impact and whether the accident caused plaintiff's alleged injuries. Plaintiff's accident reconstruction expert opined defendant's speed was roughly eight to ten miles per hour when she backed into the rear driver side panel of plaintiff's vehicle. The defense accident reconstruction expert testified defendant's vehicle was traveling just over four miles per hour at the point of impact. Both experts agreed the impact caused the rear end of plaintiff's vehicle to rotate.

With respect to plaintiff's wrist injury, plaintiff's biomechanical expert, Jai Singh, opined the sudden turning of plaintiff's steering wheel—caused by the vehicle's rotation upon impact—applied a pulling and twisting force to plaintiff's wrist that was sufficient to wrench his hand from the steering wheel. Mr. Singh testified the pulling and twisting forces involved were both accepted mechanisms for causing a TFCC tear.

Dr. Ashley, plaintiff's wrist surgeon, agreed the twisting and traction forces that threw plaintiff's hand from the steering wheel were recognized mechanisms for causing a TFCC tear. On direct examination, Dr. Ashley was asked to address Dr. Weinstein's deposition testimony concerning the cause of plaintiff's wrist injury. Dr. Ashley responded that repetitive use, such as piano playing, could not cause a TFCC tear. He testified significant trauma is required, and the swelling plaintiff experienced after the accident was an objective indication of such trauma.

Dr. Tauber, plaintiff's orthopedic surgeon, also was asked to respond to Dr. Weinstein's deposition testimony. Like Dr. Ashley, Dr. Tauber rejected Dr. Weinstein's assertion that the tear could have been caused by repetitive use, and testified that the reported "torqu[ing]" of plaintiff's wrist as it came off the steering wheel was a recognized mechanism for causing a TFCC tear. Dr. Tauber also opined that the tear was not a preexisting condition because plaintiff had been able to play the piano without pain before the accident, but had immediate swelling and pain after the accident.[3]

5.     *Defendant's Experts' Trial Testimony Concerning the Wrist Injury*

Defendant's biomechanical expert, Dr. Judson Welcher, testified the jerking motion that threw plaintiff's hand from the steering wheel would not have caused the sort of "rotation about the wrist" that commonly produces a TFCC tear. Dr. Welcher, however, conceded that the accident had caused plaintiff's car to rotate and that "twisting and torquing can cause a wrist injury."

Defendant's medical expert, Dr. Weinstein, was the last witness called by the defense. Dr. Weinstein testified, over plaintiff's objection, that he had reexamined the X-rays taken after plaintiff's initial visit to the Las Vegas Pain Institute and concluded the X-rays showed a "mild vulvar angulation of the distal radius and ulna"— the two large bones of the forearm—which indicated plaintiff had suffered a "prior fracture" of his forearm. Dr. Weinstein went on to explain, again over plaintiff's objection, that as the fracture healed it caused a shortening of the radius and an elongation of the ulna, which is

---

[3]     Defendant suggests that Dr. Tauber testified the TFCC tear was not caused by the accident. This assertion is not consistent with the whole of Dr. Tauber's trial testimony, which includes numerous unambiguous statements that plaintiff's wrist injury was caused by the accident. Further, when the testimony cited by defendant is read in context, it is apparent that Dr. Tauber understood his testimony to concern whether the tear had been caused by a preexisting condition of plaintiff's wrist, which was the subject of the immediately preceding question. Tellingly, though much is made of this testimony in defendant's respondent brief, defense counsel made no mention of Dr. Tauber's supposed admission in his closing argument to the jury. Evidently, the defense also understood during trial that Dr. Tauber had unequivocally linked plaintiff's wrist injury to the accident.

6

"one of the main causes of degenerative [TFCC] tears." When Dr. Weinstein elaborated on the relationship between an elongated ulna and TFCC tear, plaintiff objected again that the opinion had not been previously disclosed. The court overruled the objection and admonished plaintiff's counsel "not to argue in front of the jury."

On cross examination, Dr. Weinstein admitted his deposition testimony was limited to the opinion that the tear had been caused by repetitive use, and that his new opinion about the X-rays showing an angulation of the forearm bones had been formed "within the last week or 10 days." When asked to assume no prior fracture of plaintiff's forearm, Dr. Weinstein conceded that "with a normal wrist" there would be no cause for the tear other than the accident.

The defense rested with Dr. Weinstein's testimony. Plaintiff did not present a rebuttal case.

6.      *Closing Argument and Verdict*

In closing, the defense emphasized Dr. Weinstein's testimony regarding the purported forearm fracture. Defense counsel argued "the first X-ray that was ever taken showed that these bones had an abnormality," and challenged plaintiff's credibility for having "failed to divulge" the "preexisting condition." Counsel revisited the charge later in his argument, telling the jury "they want you to disregard the break in his arm. They don't want to acknowledge any preexisting condition for the wrist."

The jury found, by a nine-to-three majority, defendant's negligence was not a substantial factor in causing harm to plaintiff. The trial court denied plaintiff's motion for new trial, which challenged the admissibility of Dr. Weinstein's opinion testimony. This appeal followed.

## DISCUSSION

1.    *Standard of Review*

Plaintiff contends the trial court committed reversible error in permitting Dr. Weinstein to offer an opinion concerning the cause of plaintiff's TFCC tear that was not disclosed before trial.[4]

"[W]e review the trial court's ruling on the admissibility of expert testimony for an abuse of discretion." (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 25.) Even if erroneous, an evidentiary ruling is not reversible unless it has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, at p. 836.)

2.    *Legal Framework*

Under Code of Civil Procedure[5] section 2034.210, subdivision (a), any party may demand the exchange of expert witness information. Upon such demand, section 2034.260 requires the responding party to disclose "the general substance of the testimony that the expert is expected to give." (§ 2034.260, subd. (c)(2); *Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244, 1257 (*Williams*).) Section 2034.300, subdivision (d), provides that upon the objection of any party who has complied with section 2034.260, a trial court must exclude from evidence the expert opinion of any witness offered by a party who has unreasonably failed to make that expert available for a deposition. "As interpreted by the California courts, this requires a

---

[4]    Because we conclude the error in admitting Dr. Weinstein's testimony concerning plaintiff's wrist injury is sufficient to warrant a new trial, we do not address plaintiff's other claims concerning Dr. Welcher's trial testimony.

[5]    All statutory references are to the Code of Civil Procedure unless otherwise specified.

8

party to 'disclose the substance of the facts and the opinions to which the expert will testify, either in his witness exchange list, or in his deposition, or both.' [Citations.]" (*Williams*, at pp. 1257-1258, italics omitted; *Bonds v. Roy* (1999) 20 Cal.4th 140, 148 (*Bonds*); *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 919 (*Kennemur*).)

In *Bonds, supra,* 20 Cal.4th 140, our Supreme Court articulated the critical interests served by the expert discovery statutes' "strict procedures." (*Id.* at p. 146.) The court explained: "[T]he very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area. 'The opportunity to depose an expert during trial, particularly if the testimony relates to a central issue, often provides a wholly inadequate opportunity to understand the expert's opinion and to prepare to meet it. [Citations.]' [Citation.] '[T]he need for pretrial discovery is greater with respect to expert witnesses than it is for ordinary fact witnesses [because] . . . . [P] . . . the other parties must prepare to cope with witnesses possessed of specialized knowledge in some scientific or technical field. They must gear up to cross-examine them effectively, and they must marshal the evidence to rebut their opinions.' " (*Id.* at pp. 146-147.) "When an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-examination or rebuttal." (*Id.* at p. 147.)

The issue of whether an expert's testimony at trial may diverge from his deposition testimony has been explored by a number of courts. In *Kennemur, supra,* 133 Cal.App.3d 907, the plaintiffs in an automobile personal injury action sought to call an expert at trial to offer an opinion regarding accident reconstruction relating to the highway conditions. However, in three pre-trial depositions, the expert had consistently limited his testimony to the condition of the vehicle as a cause of the accident. (*Id.* at pp. 912-913.) The trial court precluded the expert testimony, and the Court of Appeal affirmed, holding: "When appropriate demand is made . . . [a] party must disclose either in his witness exchange list or at his expert's deposition, if the expert is asked, the

9

substance of the facts and the opinions which the expert will testify to at trial.  Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony."  (*Id.* at p. 919.)  In light of the express limitations the expert placed on his opinions at deposition, the court held defendant "was entitled to rely on [the expert's] disclaimer until such time as appellant disclosed that [the expert] had conducted a further investigation and had reached additional opinions in a new area of inquiry."  (*Id.* at p. 920.)

The court reached a similar conclusion in *Jones v. Moore* (2000) 80 Cal.App.4th 557 (*Jones*).  There, the plaintiff sued her former attorney for legal malpractice after her ex-husband stopped paying spousal support.  At his deposition, the plaintiff's expert was asked to state "everything" he believed the defendant did that fell below the standard of care.  (*Id.* at p. 563.)  In response, the expert identified four areas related to the negotiation of the underlying divorce settlement and judgment.  (*Ibid.*)  When asked whether he believed the defendant's conduct fell below the standard of care in other areas of his representation, the expert disclaimed any other opinions.  (*Ibid.*)  When asked if he anticipated doing further work to arrive at any other opinions, the expert replied, " 'No, but if I do, you will be notified well in advance, so as to be able to properly exercise your discovery rights.' "  (*Ibid.*)  At trial, the plaintiff sought to elicit testimony from her expert concerning the defendant's failure to properly secure the source of the plaintiff's spousal support income—a task unrelated to his negotiation of the underlying settlement and judgment.  (*Id.* at p. 564.)  The defendant objected, arguing the question called for an opinion beyond the scope of the expert's deposition testimony.  The trial court sustained the objection, and the Court of Appeal affirmed.

As in *Kennemur*, the court in *Jones* held the defendant was entitled to rely on the expert's express representation that he had disclosed all opinions he would offer at trial, as well as the expert's promise to notify the defendant if he formulated any new opinions. (*Jones, supra,* 80 Cal.App.4th at pp. 565-566.) In affirming the ruling below, the appellate court reasoned the expert "was in effect not made available for deposition as to the further opinions he offered at trial . . . . He promised to notify defendant if he later formulated such opinions but did not do so." (*Id*. at p. 565; see § 2034.300, subd. (d).) "Under these circumstances, exclusion of testimony going beyond the opinions he expressed during his deposition was justified. . . . When an expert deponent testifies as to specific opinions and affirmatively states those are the only opinions he intends to offer at trial, it would be grossly unfair and prejudicial to permit the expert to offer additional opinions at trial." (*Id*. at pp. 564-565.)

In *Bonds, supra,* 20 Cal.4th 140, a medical malpractice case, the defendant's expert "specifically confirmed" at his deposition that "he did not expect 'to be giving any testimony or any opinion concerning the standard of care issues that might be involved in this case.' " (*Id.* at p. 143.) At trial, during the afternoon recess of the last day of testimony, defense counsel sought to expand the scope of the expert's testimony to include the applicable standard of care. The trial court denied the request and the Supreme Court affirmed. Citing the fact that the defendant's expert "was the last defense witness, testifying in the afternoon of the last day of testimony," and the fact that the defendant made no attempt to expand the expert's testimony until just prior to his taking the stand, the court held "[t]his late request afforded no practical opportunity for [the expert] to be deposed or for [plaintiff's] own experts to rebut [his] testimony." (*Id.* at p. 149.)

3. *The Failure to Exclude Dr. Weinstein's Undisclosed Opinion Was Reversible Error*

In *Easterby v. Clark* (2009) 171 Cal.App.4th 772, the court distilled the "overarching principle" from *Kennemur, Jones,* and *Bonds* as follows: "[A] party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony

11

*if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult." (*Easterby v. Clark,*. at p. 780.) Applying this principle to the facts of the present case, we conclude the trial court abused its discretion in allowing Dr. Weinstein to offer his undisclosed opinion about the cause of plaintiff's TFCC tear and this error resulted in a miscarriage of justice.

At his deposition, Dr. Weinstein affirmed that (1) he had expressed all opinions he intended to give at trial concerning the cause of plaintiff's wrist injury, and (2) he would advise plaintiff if he formed any new opinions prior to trial. As in *Kennemur* and *Jones*, plaintiff was entitled to rely on Dr. Weinstein's assurances until such time as defendant disclosed that Dr. Weinstein had conducted a further investigation and reached additional opinions. (*Kennemur, supra,* 133 Cal.App.3d at p. 920; *Jones, supra,* 80 Cal.App.4th at pp. 565-566.) No such disclosure was made, though Dr. Weinstein admitted he formed the new opinion "within the last week or 10 days" before taking the stand. Rather, much like in *Bonds*, defendant's counsel made no effort to advise plaintiff of the new opinion until Dr. Weinstein—the last defense witness—testified on the last day of trial, at a time that afforded "no practical opportunity" for another deposition or for plaintiff's own experts to rebut his testimony. (*Bonds, supra,* 20 Cal.4th at p. 149.) Under these circumstances, it was an abuse of discretion to admit Dr. Weinstein's undisclosed opinion testimony at trial. (Cf. *Bonds,* at p. 149; *Jones,* at pp. 564-565.)

Defendant contends plaintiff "had ample opportunity to cross-examine [Dr. Weinstein] at trial," thus "no prejudice exists to support reversal." This argument begs the question. The prejudice to plaintiff was the "lack [of] a fair opportunity to *prepare* for cross-examination." (*Bonds, supra,* 20 Cal.4th at p. 147, italics added.) The opportunity to cross-examine Dr. Weinstein on his new opinion *for the first time at trial*—no matter how "ample"—did not ameliorate this prejudice. (See *ibid.* [" 'The opportunity to depose an expert during trial, particularly if the testimony relates to a central issue, often provides a wholly inadequate opportunity to understand the expert's opinion and to prepare to meet it. [Citations.]' "].)

Nor do we agree with defendant's contention that plaintiff's medical experts had ample opportunity to refute Dr. Weinstein's opinion. Quite the contrary. Because plaintiff was not advised of the new opinion, his experts' direct examination was understandably limited to addressing Dr. Weinstein's deposition testimony linking the TFCC tear to repetitive use. Plaintiff's experts had no opportunity to directly refute Dr. Weinstein's contention about the purported fracture, nor his opinion that the resulting angulation of the forearm bones likely caused the TFCC tear. The failure to give plaintiff notice of Dr. Weinstein's new opinion—as had been promised at his deposition—deprived plaintiff and his experts of any practical opportunity to rebut Dr. Weinstein's trial testimony. (See *Bonds, supra,* 20 Cal.4th at p. 143.)

The record shows Dr. Weinstein's undisclosed opinion about a preexisting forearm fracture was the principal rationale the defense offered for rejecting plaintiff's evidence regarding the cause of the TFCC tear. Indeed, Dr. Weinstein admitted that absent the fracture and with a "normal wrist" there would be no cause for the tear other than the accident. But despite the defense's own failure to disclose the opinion before trial, defense counsel emphasized the supposed prior fracture in his closing argument, and even challenged plaintiff's credibility for having "failed to divulge" the condition to the jury. Given defendant's reliance on Dr. Weinstein's testimony to explain the cause of plaintiff's injured wrist, it is reasonably probable that a result more favorable than a defense verdict would have been reached in the absence of the trial court's error. (See *Basham v. Babcock* (1996) 44 Cal.App.4th 1717, 1723-1724 [finding prejudicial error in low-speed vehicular injury case where trial court improperly admitted causation opinion by supplemental expert that exceeded scope of designated expert's deposition testimony].)

## DISPOSITION

The judgment is reversed.  Plaintiff Charles Olson is entitled to his costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



KITCHING, J.

We concur:



KLEIN, P. J.



ALDRICH, J.